# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARIA SALDANA,<br>　　　　Plaintiff<br><br>　　　v.<br><br>COOK COUNTY HEALTH &<br>HOSPITALS SYSTEM,<br>　　　　Defendant | No. 19 CV 6178<br><br>Judge Jeremy C. Daniel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Saldana filed suit against Defendant Cook County Health & Hospitals System ("Cook County Health"), alleging violations of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Section 1557 of the ACA, 42 U.S.C. § 18116 (collectively, the "Acts"), for failing to provide a reasonable accommodation that allowed for effective communication with medical staff. The defendant counters that it satisfied its obligations under the Acts by providing Saldana access to video remote interpreting ("VRI") services. The parties' cross-motions for summary judgment are now pending before the Court. (R. 76; R. 79.)[1] For the reasons below, the parties' respective motions are denied.

---

[1] For CM/ECF filings, the Court cites to the page number(s) set forth in the document's CM/ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## PRELIMINARY MATTERS

Before delving into the record, the Court addresses the parties' respective motions to strike certain paragraphs and evidentiary support contained in their adversary's Local Rule 56.1 submissions. Specifically, the defendant argues that certain paragraphs included in Saldana's Statement of Facts (*see* R. 81 ("Pl.'s SOF")), and Statement of Additional Facts in Response to Defendant's Motion for Summary Judgment, (*see* R. 93 ("Pl.'s SOAF")), must be stricken as violative of Local Rule 56.1. (R. 95 at 2–3; R. 103 at 1–2.) Saldana, on the other hand, moves to strike the report of the defendant's expert witness and the lay opinions of certain of the defendant's employees as inadmissible. (R. 101 at 3–4.)

### I. DEFENDANT'S MOTION TO STRIKE CERTAIN PARAGRAPHS

The defendant requests that the Court strike paragraphs 5, 6, 9, 13, 22, 42, 52, 65, 66, and 69 of Saldana's Statement of Facts and paragraphs 19, 21, 27–29, 33, and 39–40 of her Statement of Additional Facts because they contain multiple facts per paragraph. (R. 95 at 2; R. 103 at 1.) The defendant further contends that, when accounting for the multiple facts contained in the above paragraphs, Saldana's Local Rule 56.1 submissions exceed the maximum number of paragraphs allowed and, accordingly, any such paragraphs that exceed the allotted amount should also be struck. (R. 95 at 2; R. 103 at 1–2.)

The defendant's argument implicates Local Rule 56.1, which governs the procedures for filing motions for summary judgment. *See* N.D. Ill. Local R. 56.1. Under Local Rule 56.1, each statement of material facts and statement of additional facts "must consist of concise numbered paragraphs," and each fact "must be

supported by citation to the specific evidentiary material . . . that supports it." N.D. Ill. Local R. 56.1(d)(1)–(2). Conciseness does not require "a strict one-fact-per-paragraph approach;" rather, a concise paragraph is one that is "easy to read" and for which "it is simple to check if the evidence supports it." *Allen v. Benton*, 18 C 4047, 2022 WL 18147674, at *6 (N.D. Ill. Feb. 25, 2022). The rule further provides that a movant's statement of material facts may not exceed 80 numbered paragraphs, and an opposing party's statement of additional facts must not exceed 40 paragraphs. N.D. Ill. Local R. 56.1(d)(5). As with any Local Rule, the parties' compliance is expected as it allows for the "smooth [and] efficient operation of the judicial system." *Allen*, 2022 WL 18147674, at *1. "[W]hether to apply the rule strictly or to overlook any transgression[,]" however, "is [ ] left to the district court's discretion." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

In this case, the Court declines to strike the challenged paragraphs. Though consisting of multiple facts, Saldana's paragraphs are not "encyclopedic" with citation to evidentiary support in blanket fashion. *See Allen*, 2022 WL 18147674, at *6 (striking paragraphs where plaintiff "failed to put the evidence on the table in a digestible format," instead leading the court on "a wild goose chase"). Instead, Saldana's Rule 56.1 submissions are logically grouped with citation to specific evidence and formatted in such a way that does not "significantly hamper[ ] review and adjudication" of the motions. *Eberly v. Harnack*, No. 19 C 6129, 2022 WL 17668676, at *1 (N.D. Ill. Dec. 14, 2022) (citing *Little v. JB Pritzker for Governor*, 18 C 6954, 2021 WL 3666429, at *1)). Simply put, the Court does not find that Saldana's

paragraphs, albeit lengthy, render her motion "indigestible." *Allen*, 2022 WL 18147674, at *6. The Court therefore declines to strike paragraphs 5, 6, 9, 13, 22, 42, 52, 65, 66, and 69 of Saldana's Statement of Facts and paragraphs 19, 21, 27–29, 33, and 39–40 of her Statement of Additional Facts.

## II. PLAINTIFF'S MOTION TO STRIKE CERTAIN EVIDENCE

Saldana moves this Court to strike an unsworn expert report by Susan Maupin, J.D., R.N., in which she opines on whether the defendant's Language Interpretation Services Policy is compliant with the Acts. (R. 101 at 3; *see also* R. 78-10.) Because the report is unsworn, it is inadmissible under Federal Rule of Civil Procedure 56(e). *See also Geraci v. Macey*, 14 C 6876, 2016 WL 3671400, at *3 (N.D. Ill. July 11, 2016). But even if it were sworn, neither of the parties' motions for summary judgment turn on the facts contained in Maupin's report. The Court thus does not consider the report in adjudicating their motions, notwithstanding that it is unsworn.

Saldana further moves to strike the lay opinions of Constance Toliver, one of defendant's employees, regarding the use of VRI at its hospitals, and Christine M. Holden, PA-C, one of the defendant's physician's assistants, regarding Saldana's ability to understand certain communications. (R. 101 at 3-4 (citing R. 97 ("Def.'s SOAF") ¶¶ 2, 10–13.)

Federal Rule of Evidence 701 permits a witness to testify in the form of opinions or inferences where they are "(a) rationally based on the perception of the witness, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other

4

specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Prior to providing such testimony, the witness must first establish personal knowledge of the facts which form the basis of their opinion or inference. Fed. R. Evid. 602. A witness may establish the requisite knowledge to offer a lay opinion by virtue of their position within a particular profession. *See Cent. States, Se. & Sw. Areas Pension Fund v. Transp. Serv. Co.*, No. 00 C 6181, 2009 WL 424145, at *5 (N.D. Ill. Feb. 17, 2009).

Saldana argues that certain testimony from Toliver's deposition should be stricken as inadmissible lay opinion testimony because the defendant has not provided evidence that Toliver has any experience or training using VRI or interacting with deaf patients. (R. 101 at 3 (citing R. 78-1 ("Toliver Dep.") at 80:12–18, 81:09–12, 92:23–93:02).) But Toliver has established personal knowledge by testifying about her position within the healthcare industry. Toliver testified that she was employed with the defendant for over thirty-one years and held various positions during that timeframe, including "Policy Lead." (Toliver Dep. at 13:11–14:8, 16:07–24, 67:08–11.) In this role, Toliver oversaw the creation and revision of policies governing patients' rights, including the Interpreter Services Policy and Deaf and Hard of Hearing Services Policy. (*Id.* at 67:08–68:07.) Toliver also testified that she acquired the knowledge to write and revise such policies during her tenure at the hospital and through trainings and continuous education. (*Id.* at 68:08–24.) Her personal knowledge regarding the use and effectiveness of providing interpreter services via VRI is thus based on her perceptions from her experience in the hospital

industry. This is sufficient foundation for Toliver to provide lay opinion testimony. *See Cent. States,* 2009 WL 424145, at *6.

Additionally, Saldana moves to strike a note authored by Holden in Saldana's medical records to establish effective communication using VRI. (R. 101 at 4; *see also* R. 78-8 at 2; Def.'s SOAF ¶ 2.) Saldana does not, however, challenge the witness's qualifications to offer lay opinion testimony, nor does she challenge the admissibility of the medical record itself. To the extent Saldana's medical records raise factual disputes, they will be addressed later in the opinion.

## FACTUAL BACKGROUND[2]

Plaintiff Maria Saldana is profoundly deaf and primarily uses signing to communicate with others. (R. 96 ("Def.'s Resp. to Pl.'s SOF") ¶¶ 1–2; R. 94 ¶¶ 19, 21 ("Pl.'s Resp. to Def.'s SOF").) On October 13, 2017, Saldana presented to Stroger Hospital, a public hospital in Cook County, Illinois, complaining of pain in her left breast. (Pl.'s Resp. to Def.'s SOF ¶¶ 32–33; Def.'s Resp. to Pl.'s SOF ¶ 5.) Stroger Hospital is part of Defendant Cook County Health's hospital network. (Def.'s Resp. to Pl.'s SOF ¶ 5.)

Saldana's October 2017 visit marked the first time that she sought treatment for breast pain at Stroger Hospital. (Pl.'s Resp. to Def.'s SOF ¶ 35.) Saldana was supposed to receive a biopsy of an abnormal mass in her breast at Loyola Medicine's Gottlieb Memorial Hospital ("Loyola Gottlieb Hospital"), but could not continue

---

[2] The Court takes the following facts from the parties' Local Rule 56.1 submissions, the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3).

treatment there for financial reasons. (*Id.* ¶¶ 29, 30; Def.'s Resp. to Pl.'s SOF ¶ 20.)
Loyola Gottlieb Hospital recommended that Saldana go to Stroger Hospital for
treatment. (Pl.'s Resp. to Def.'s SOF ¶ 31.) Stroger Hospital is further away from
Saldana's home than Loyola Gottlieb Hospital. (*Id.* ¶¶ 27, 28.)

At the time of Saldana's medical care, the defendant maintained a system-wide
Interpreter Services Policy and a Services for the Deaf and Hard of Hearing Policy
(together, the "Policies"). (Def.'s Resp. to Pl.'s SOF ¶¶ 28–32; R. 80-5 at 10–35.) The
Policies in question require staff to discuss communication needs with patients and
to provide services based on patients' stated preferences. (R. 80-5 at 19.) Staff are
instructed to record the patient's preferred method of communication during the
initial intake. (*Id.* at 21.) Services available under the Policies include sign language
interpreters and VRI, among other aids. (*Id.* at 20–21.)

The Policies note that "VRI equipment is the first choice in providing sign
language interpretation." (*Id.* at 20.) VRI is defined under the Policies as "[d]eaf sign
language interpreting utilizing a portable compute[r]/work station on wheels (WOW),
connected to the internet to a remote interpreter off site." (*Id.* at 21.) Constance
Toliver, who served as the defendant's Policy Lead during the relevant time period,
testified that VRI is the defendant's "standard" for "providing reasonable
accommodations" to their "deaf and hearing impaired patients." (Def.'s Resp. to SOF
¶¶ 33, 40; Toliver Dep. at 66:24–67:20, 87:13–16.)

The Policies further state that VRI may not be appropriate in certain
situations, including "1) services request [*sic*] in a Wi-Fi dead zone without internet

7

connectivity, 2) unavailable or non-functioning VRI units, and/or 3) mentally-impaired patients unable to understand or communicate through a monitor screen." (R. 80-5 at 20.) In the event of such circumstances, the Policies provide that the "LSH/OT/PT Department[3] [ ] maintains a sign language interpreter staffing agency contract to provide live interpreters 24 hours, 7 days weekly." (*Id*.) John Daley, the defendant's Director of Support Services, testified that in-person sign language interpreters needed to be scheduled in advance. (Def.'s Resp. to Pl.'s SOF ¶¶ 45, 48; Pl.'s Resp. to Def.'s SOF ¶ 18; R. 78-2 ("Daley Dep.") at 19:20–22, 35:20–36, 45:04–10.) "To avoid delays and to reduce interpreter fees for live interpreters," the Policies state that "every attempt should be made to schedule patients with at least 4 days advance notice when possible." (R. 80-5 at 23.) Despite this proviso, the defendant did not employ or have a contract with in-person sign language interpreters for services at Stroger Hospital or its Oncology Department in October 2017. (Def.'s Resp. to Pl.'s SOF ¶ 62.)

When Saldana arrived at Stroger Hospital on October 13, 2017, she presented a Midwest Center on Law and the Deaf ("MCLD") card that indicated she required an ASL or a Spanish Sign Language interpreter to effectively communicate. (Pl.'s Resp. to Def.'s SOF ¶ 37; R. 78-9 at 1–2; R. 80-2 ("Saldana Dep. 2") at 18:09–13.) The card provided contact information for two agencies that could assist in finding an interpreter, if needed, but did not indicate that the interpreter must be an "on-site"

---

[3] The LSH/OT/PT Department is the Language Speech and Hearing, Occupational Therapy, and Physical Therapy division within Cook County Health. (Daley Dep. at 45:16–20, 124:06–07.)

or "in-person" interpreter. (R. 78-9 at 1–2.) The defendant provided Saldana with an
ASL interpreter via VRI. (Pl.'s Resp. to Def.'s SOF ¶ 6.) Saldana was admitted for
suspected breast cancer and remained hospitalized until October 16, 2017, when she
was discharged. (Def.'s Resp. to Pl.'s SOF ¶ 7.) Prior to her discharge, Saldana
conveyed to hospital staff that she did not understand why she was going home. (Pl.'s
Resp. to Def.'s SOF ¶ 45; R. 78-8 at 11, 18, 22.)

Saldana returned to Stroger Hospital two weeks later, on October 30, 2017, to
receive a mammogram. (Pl.'s Resp. to Def.'s SOF ¶ 49; R. 78-8 at 4–6.) The next day,
she had an appointment at the defendant's Breast Oncology Outpatient Clinic. (Pl.'s
Resp. to Def.'s SOF ¶ 53; Def.'s Resp. to Pl.'s SOF ¶ 8; R. 78-8 at 2–3.) Saldana was
accompanied by her deaf advocate, Caroline Nemecek, for this appointment. (Def.'s
Resp. to Pl.'s SOF ¶ 8; Pl.'s Resp. to Def.'s SOF ¶¶ 23, 25.) Nemecek reads, interprets
documents, and communicates with Saldana in-person and through video phone
services. (Pl.'s Resp. to Def.'s SOF ¶¶ 24–25.)

At the appointment, Nemecek stated that Saldana needed a "Certified Deaf
Interpretor [sic] . . . for best communication." (Def.'s Resp. to Pl.'s SOF ¶ 10; R.78-8
at 2.) Stroger provided Saldana with VRI. (Pl.'s Resp. to Def.'s SOF ¶ 55.) Leonora
Martin, who was responsible for the day-to-day operations of Stroger's Oncology
Department in 2017, testified that the defendant's policy is to provide VRI as the first
choice for sign language interpretation. (Def.'s Response to Pl.'s SOF ¶¶ 54-55; R. 80-9
at 17:13–17, 45:07–13.) During the appointment, Saldana exhibited signs of a seizure

and was transferred to Stroger's Emergency Department where VRI was again provided. (Pl.'s Response to Def.'s SOF ¶ 53; Def.'s Response to Pl.'s SOF ¶ 11.)

Saldana described her visit to Stroger on October 31st as a negative experience. (Pl.'s Resp. to Def.'s SOF ¶ 57; Saldana Dep. 2 at 30:19–30:22.) She testified that the technology for the VRI is "just not good" and that Stroger Hospital's VRI technology "freezes and is not clear all the time." (Pl.'s. Resp. to Def.'s SOF ¶ 57; Saldana Dep. 2 at 16:3–08, 17:16–17.) Saldana further testified that interpretation is "better in person" and that Loyola Gottlieb Hospital has in-person interpreters, but she cannot go there because she does not have medical insurance and cannot afford treatment. (Pl.'s Resp. to Def.'s SOF ¶ 57; Def.'s Resp. to Pl.'s SOF ¶ 20; Saldana's Dep at 16:3–08, 19:21–24, 31:18–23.) Saldana has not been hospitalized for breast pain or treatment since October 2017. (Pl.'s Resp. to Def.'s SOF ¶ 60.) The parties dispute whether Saldana ever returned, or attempted to return, to Stroger Hospital for treatment after 2017. (Def.'s Resp. to Pl.'s SOF ¶¶ 12, 17.)

Saldana brought this action alleging that the defendant violated Title II of the ADA (Count I), Section 504 of the Rehabilitation Act (Count II), and Section 1557 of the ACA (Count III). (*See generally* R. 11 ("FAC").) Specifically, Saldana alleges that the defendant failed to provide her with auxiliary aids and services to enable effective communication with the defendant's medical and nursing staff during her visits to Stroger Hospital. (R. 80 at 3.) The parties each move for summary judgment on all of Saldana's claims. (R. 76; R. 79.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court "construe[s] all facts and draw[s] all reasonable inferences in the nonmoving party's favor, but the moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chi.*, 964 F.3d 590, 597 (7th Cir. 2020)). While the Court must give the nonmoving party "the benefit of reasonable inferences from the evidence," it does not construe "speculative inferences in his favor." *White*, 829 F.3d at 841. "Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017) (citing *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)).

## ANALYSIS

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such a disability, be excluded from participation in or be denied the

11

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *King v. Hendricks Cnty. Comm'rs.*, 954 F.3d 981, 988 (7th Cir. 2020) (citing 42 U.S.C. § 12132). "To establish a violation of Title II of the ADA, the plaintiff must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability.'" *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12131)).

A Rehabilitation Act claim brought under Section 504 is "functionally identical" to a Title II ADA claim. *Id.* Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) (citing 29 U.S.C. § 794(a)). The analysis governing both the ADA and the Rehabilitation Act is thus the same save for the Rehabilitation Act's additional element of receipt of federal funds. *Wagoner*, 778 F.3d at 592.

Similarly, the ACA provides that "an individual shall not, on the grounds prohibited by [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

*LeRoy v. Ingalls Mem'l Hosp.*, No. 20 C 6203, 2021 WL 4264360, at *4 (N.D. Ill. Sept. 20, 2021) (citing 42 U.S.C. § 18116). Thus, for disability-discrimination claims, "the ACA incorporates the substantive analytical framework of the [Rehabilitation Act.]" *Marquez v. Bd. of Trs. of Univ. of Ill.*, No. 21 C 3357, 2022 WL 326967, at *5 (N.D. Ill. Feb. 3, 2022); *see also LeRoy*, 2021 WL 4264360, at *4 ("Claims brough under the ACA import the same standard and burden of proof as Rehabilitation Act claims.")

The parties do not contest that Saldana is a "qualified individual with a disability" within the meaning of the statutes. (R. 77 at 6.) Nor do the parties dispute that the defendant is a "public entity," as required by the ADA, that "receiv[es] Federal financial assistance," as required by the Rehabilitation Act and the ACA. (*Id.*) The disputes here concern: (1) whether the defendant denied Saldana a reasonable accommodation in violation of the Acts; (2) whether the defendant's actions constitute deliberate indifference, entitling Saldana to compensatory damages; and (3) whether Saldana can pursue prospective injunctive relief. (R. 77 at 7–19; R. 80 at 9–23.)

## I. WHETHER THE DEFENDANT DENIED SALDANA A REASONABLE ACCOMMODATION

Although the ADA, the Rehabilitation Act, and the ACA do not explicitly address accommodations, their implementing regulations require public entities to provide accommodations that are both reasonable and necessary to the disabled person's needs, and that afford the individual equal opportunity to participate in services. *See Novak v. Hall*, 139 F. Supp. 3d 901, 910–11 (N.D. Ill. 2015); *see also* 28 C.F.R. § 35.101 (ADA); 45 C.F.R. § 84.51 (Rehabilitation Act); 45 C.F.R. § 92.1 (ACA). Reasonable means that the accommodation is "efficacious and proportional to the

costs to implement it." *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 543 (7th Cir. 1995). Necessary means that "the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Novak,* 139 F. Supp. 3d at 910. And equal opportunity, for purposes of this case, means "that communications with" disabled individuals "are as effective as communications with others." 28 C.F.R. § 35.160(a)(1); *see also* 45 C.F.R. § 84.52(a); 45 C.F.R. § 92.102(a).

In circumstances such as those presented here, the touchstone of the accessibility analysis is whether the auxiliary aids and services provided were sufficient to achieve effective communication with deaf patients. *See e.g., Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 863 (9th Cir. 2022); *Juech v. Child.'s Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 781 (E.D. Wis. Nov. 2, 2018). "Auxiliary aids or services" are defined by both statute and regulation and include qualified, on-site interpreters and VRI services. 42 U.S.C. § 12103(1); 28 C.F.R. § 35.104(1); 45 C.F.R. §§ 84.52(d)(3), 92.102(b)(1)(i). Under Title II of the ADA, public entities are required to give "primary consideration" to a disabled individual's choice of auxiliary aid when determining what types of aids or services are necessary to achieve effective communication. 28 C.F.R. § 35.160(b)(2). Under the primary-consideration rule, a public entity must ordinarily honor the disabled person's choice unless it can demonstrate that another equally effective means of communication is available or that the use of the means chosen would result in an undue burden. *See* 28 C.F.R. Pt. 35, App. A; 28 C.F.R. § 35.164; *see also Reyes v. Dart*, No. 17 C 9223, 2019 WL

1897096, at *6 (N.D. Ill. Apr. 29, 2019) (explaining that a showing that an effective means of communication was provided (albeit different than the plaintiff's preferred accommodation) can defeat an ADA claim); *Novak*, 139 F. Supp. 3d at 914 (explaining that the plaintiff's choice need not be honored in certain circumstances, such as when the preferred choice would create an undue burden).

An analysis like this frequently implicates disputed issues of fact and is therefore often "ill-suited for summary judgment." *Reyes*, 2019 WL 1897096, at *6; *see also Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) ("The task of determining whether an entity subject to the [Rehabilitation Act] has provided appropriate auxiliary aids where necessary is inherently fact-intensive and it is precisely because of this fact-intensive inquiry that an effective-communication claim often presents questions of fact precluding summary judgment."); *Folkerts v. City of Waverly*, 707 F.3d 975, 984 (8th Cir. 2013) ("The inquiry [under § 35.160] is inherently fact-intensive and largely depends on context."). This is so because the "[t]he type of auxiliary aid or service necessary to ensure effective communication" varies based on "the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2); *see also* 45 C.F.R. § 92.102(a); *Bax*, 52 F.4th at 867 (explaining that the appropriateness of an auxiliary aid is a "fact-intensive exercise" that involves the trier of fact weighing several factors pertaining to the individual, the communication, and the context.) "Of course, that is

15

not to say that the question is never appropriate for summary judgment." *Juech*, 353 F. Supp. 3d at 779. But such is not the case here.

Saldana contends that she was denied the opportunity to participate in her medical care during her visits to Stroger Hospital because the defendant did not give primary consideration to her preferred method of communication, *i.e.*, a live ASL interpreter or CDI, and instead defaulted to using VRI technology. (R. 80 at 10–11.) The defendant counters that Saldana's MCLD card does not specify that the interpreter provided need be in-person, (R. 78-9 at 1–2), and that Saldana's medical records note that her "Preferred Learning Method" is "Talk, Media (kiosk, videos, interactive displays)." (R. 78-8 at 7.) The ultimate issue, however, "is not whether [Saldana] requested a particular accommodation[;]" rather, it is "whether [the defendant] took appropriate steps to ensure that effective means of communication were provided." *Meyer v. Walthall*, 528 F. Supp. 3d 928, 960 (S.D. Ind. 2021).

The defendant argues that the VRI technology that they provided to Saldana during each of her visits allowed her to effectively communicate with medical staff. In support of this argument, the defendant relies on various notes in Saldana's medical records indicating that she was able to self-report symptoms, respond to certain instructions, ask for clarification, and acknowledge her understanding. (R. 77 at 8–9.) This, the defendant argues, "demonstrate[s] an open and effective flow of communication between medical staff and" Saldana using VRI technology. (*Id.* at 9.)

But even accepting these facts as true, "the mere successful communication of the primary symptoms, treatment plan, and discharge instructions" is insufficient,

"as a matter of law, to preclude liability under the [Acts]." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 835 (11th Cir. 2017). "Effective communication is a two-way exchange. That hospital personnel were able to get the information they needed from [Saldana] does not establish that [Saldana] was able to get the information she needed from them." *Juech*, 353 F. Supp. 3d at 780. Indeed, Saldana identifies various instances in the medical record from which a reasonable factfinder could conclude that she was not able to effectively communicate with medical staff using VRI. (*See e.g.,* R. 80-5 at 179 ("Patient unable to communicate with sign language interpretor [*sic*] over video, unable to get further history."); *id.* at 180 ("Hx limited due to hearing impairment and unable to communicate with english [*sic*] sign language interpreter.); *id.* at 182 ("When asked about the events using the video interpreter, the patient simply referred to some printed medical records that indicated the reason for her appointment, but could not answer the questions asked of her.").) The Court thus cannot conclude, as a matter of law, that the VRI was a reasonable accommodation.

Further, Saldana has put forth evidence of connectivity issues and lack of proper training on the use and operation of VRI technology. (*See, e.g.,* Saldana Dep. 2 at 17:16–17 ("Th[e] technology freezes and is not clear all the time"); Nemecek Dep. at 54:01–02 ("So Maria could not see the VRI interpreter. It needed to be turned around.").) A public entity that chooses to provide interpreters via VRI must ensure that it provides "high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;" as well as "[a]dequate training to users of the technology . . . so that they may quickly and efficiently set up

17

and operate the VRI." 28 C.F.R. § 35.160(d)(1), (4). The persistence and severity of the technological and training failures described by Saldana could lead a reasonable fact finder to conclude that the VRI denied her the ability to effectively communicate with medical staff. *See, e.g., Juech*, 353 F. Supp. 3d at 782 ("It is up to the finder of fact to determine whether the problems [the plaintiff] allegedly encountered were sufficiently severe so as to render the VRI ineffective means of communication.").

Notwithstanding Saldana's evidence as to the shortcomings of the VRI technology, the defendant argues that honoring Saldana's preferred choice of accommodation—that is, an on-site, in-person ASL or CDI—would result in an undue burden. (*See* R. 77 at 10–13); *see also* 28 C.F.R. § 35.164 (explaining that a public entity is not required to take "any action that it can demonstrate would result in . . . undue financial and administrative burdens.") This argument is based on the sweeping assertion that providing Saldana's requested accommodation entails entirely "[r]idding the Defendant of the use of VRI for on-site interpretation services." (R. 77 at 13.) But the evidence does not support the necessity of such an overhaul, particularly when the defendant's employees testified that the defendant employs interpreters for certain non-English speaking patients in addition to the VRI technology. (Daley Dep. at 111:24–112:02 ("VRIs are available 24/7 and also Spanish and Polish interpreters. Employed Spanish and Polish interpreters are available."); Toliver Dep at 87:14–20 (explaining that VRI is the "standard in providing reasonable accommodations" for all languages "outside of Spanish and Polish").) At best, the defendant's undue burden argument amounts to speculation as to the difficulty and

18

expense involved in employing an on-site ASL interpreter at the hospital. (*See, e.g.*, R. 77 at 12 ("[Saldana] herself had trouble scheduling and coordinating CDI and ASL interpreters to simply review [her] depositions. . . . To require more of Cook County, who had limited resources and [more] notice than a private law firm, runs inapposite of the reasonableness requirements of the Acts.").) But mere speculation does not defeat Saldana's claims on summary judgment. *See Hartford Fire Ins. Co. v. Taylor*, 903 F. Supp. 2d 623, 646 (N.D. Ill. 2012).

Ultimately, the Court finds that there are genuine issues of material fact about whether the defendant's VRI technology afforded Saldana the ability to effectively communicate with medical staff during her visits to Stroger Hospital. Because Saldana has failed to establish that she is entitled to judgment as a matter of law on her claims, the Court denies her motion for summary judgment.

## II. DELIBERATE INDIFFERENCE AND COMPENSATORY DAMAGES

Notwithstanding the factual disputes precluding summary judgment on the accommodation issue, the defendant argues that Saldana cannot proceed to trial because she cannot show that she is entitled to compensatory damages under the Acts. (R. 77 at 13–17.) To recover monetary damages for her alleged injuries, Saldana must prove that the failure to provide appropriate auxiliary aids was the result of intentional discrimination. *See Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 862 (7th Cir. 2018); *Reyes*, 2019 WL 1897096, at *5. The Seventh Circuit has held that "[a] plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference." *Lacy*, 897 F.3d at 862. The deliberate-indifference standard is equally applicable for recovery under the Rehabilitation Act and the ACA. *See id.*

at 862-63; *Marquez v. BHC Streamwood Hosp., Inc.*, No. 20 C 4267, 2021 WL 4282948, at *5 (N.D. Ill. Sept. 21, 2021).

Deliberate indifference requires proof of "both (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)). For the first prong, "[a] plaintiff can satisfy the knowledge element by showing that he 'alerted the public entity to his need for accommodation or [that] the need for accommodation is obvious or required by statute or regulation.'" *Reyes*, 2019 WL 1897096, at *9 (quoting *Updike v. Multnomah Cnty.*, 870 F.3d 939, 951 (9th Cir. 2017)). For the second prong, a plaintiff must show that the defendant's failure to act involved an element of deliberateness. *Id.* at *10. Negligence alone is not enough. *See id.* In other words, to establish her claim for compensatory damages, Saldana "must show ineffective communication done with knowledge that it was substantially likely to occur." *Crane*, 898 F.3d at 1135.

The defendant argues that Saldana has failed to put forth evidence of deliberate indifference, as the record shows that, upon being presented with Saldana's MCLD card, it acknowledged her disability and provided her with a reasonable accommodation via VRI technology. (R. 77 at 14–16.) According to the defendant, the fact that the VRI technology was imperfect or not Saldana's preferred choice amounts to, at most, negligence, not deliberate indifference. *Id.* at 14–15. Saldana counters that the defendant failed to conduct any investigation into what accommodations would be reasonable for her specific needs, instead defaulting to the

20

use of VRI technology and continuing its use despite its technological shortcomings and the defendant's knowledge that it would lead to further ineffective communication, as indicated by Saldana's medical records. This, argues Saldana, is deliberate indifference. (R. 80 at 18–20.)

The Court finds that there are triable issues of fact as to whether the defendant was deliberately indifferent to Saldana's rights. Saldana testified that she repeatedly requested an in-person interpreter during her visits to Stroger Hospital, but "was told again and again no[;]" and, thus, always had to use VRI. (Saldana Dep. 2 at 17:14–20.) Although providing VRI rather than an in-person interpreter "is not necessarily deliberately indifferent to an individual's rights . . .[,]" the defendant may be found deliberately indifferent where it is aware of problems with VRI but insists on its use anyway. *Juech*, 353 F. Supp. 3d at 784.

Here, there is sufficient evidence to support such a conclusion. Saldana's medical records show various instances in which medical staff could not obtain Saldana's medical history, assess her symptoms, or obtain answers to their questions, despite the use of VRI. (*See e.g.,* R. 80-5 at 179–80, 182, 184, 187–88.) Indeed, on at least one occasion, staff had to obtain answers from Saldana through Nemecek. (*Id.* at 186 ("She did not respond to many questions that advocate, Carol, was able to answer or explain to her and then elicit response.").) Not only is using a patient's advocate as an interpreter prohibited under the defendant's Policies, (R. 80-5 at 21), but it furthers the inference that medical staff were aware that additional aids were needed to effectively communicate with Saldana, yet continued to provide her with

VRI. *See, e.g., Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 351 (11th Cir. 2012) (the doctors "apparent knowledge" that plaintiff "required an additional interpretive aid to effectively communicate with him and his deliberate refusal to provide that aid satisfies the deliberate indifference standard).

Further, the defendant's Policies state that "VRI equipment is the first choice in providing sign language interpretation," (R. 80-5 at 14), and Toliver testified that VRI is the defendant's "standard" in providing reasonable accommodations to all deaf, hearing impaired, and limited or non-English speaking patients, save for Spanish and Polish speakers. (Toliver Dep. at 87:13–20.) Indeed, the defendant provides no evidence of any contracts with live sign language interpreters for Stroger Hospital or its Oncology Department in 2017, instead relying on contracts maintained through other divisions of Cook County Health which required advance scheduling. (R. 80-5 at 5, 20; Daley Dep. 35:21–36:03.) In fact, Saldana presents evidence that she tried to schedule an in-person interpreter for an appointment with one of the defendant's providers in 2019, but was instead provided with VRI and told that live interpreters were *never* provided—despite the contrary language in the Policies. (Nemecek Dep. at 41:20–45:24.) Such evidence could reasonably support a finding that an in-person interpreter was not a genuine option for accommodating Saldana's needs and that her requests for one were deliberately ignored. *See e.g., Reyes*, 2019 WL 1897096, at *11 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)) ("[A] public entity does not 'act' by proffering just any accommodation: it must consider the

particular individual's need when conducting its investigation into what accommodations are reasonable.")

Finally, the defendant's Policies account for instances in which VRI is not an appropriate accommodation, including "services request in a WiFi dead zone without internet connectivity . . .." (R. 80-5 at 20.) In this case, Saldana testified that the VRI consistently froze during her initial stay at Stroger Hospital, (Saldana Dep. 2 at 17:14–20), and Nemecek testified that the VRI kept freezing at her follow-up appointment a few weeks later. (Nemecek Dep. 53:03–04, 54:22–55:01.) Additionally, Daley testified that there were "probably [WiFi] dead zones everywhere" in the hospital, though he could not say where. (Daley Dep. 117:04–14.) A reasonable jury could find from such evidence that the defendant was aware that its VRI technology was not an effective means of communication in all areas of the hospital yet insisted on its use, notwithstanding. *See, e.g., Juech*, 353 F. Supp. at 784.

In sum, Saldana has presented sufficient evidence of deliberate indifference to withstand summary judgment. It follows that she may seek damages and therefore go to trial on her disability discrimination claims. Defendant's motion for summary judgment on this issue is, thus, denied.

### III.   STANDING TO PURSUE PROSPECTIVE INJUNCTIVE RELIEF

The defendant also challenges Saldana's standing to pursue prospective injunctive relief. (R. 77 at 17–19.) Saldana's first amended complaint requests an injunction  enjoining the defendant from discriminating against her and requiring it to "(i) adopt and implement a legally compliant communication access policy; (ii) make available to [her] an array of auxiliary aids and services; and (iii) provide

its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are deaf[.]" (FAC at 9, 12, 15.)

Unlike compensatory damages, a plaintiff need only prove that the public entity failed to provide a reasonable means of effective communication to seek injunctive relief under Title II of the ADA. *See Scherr v. Marriott Int'l., Inc.*, 703 F.3d 1069, 1075-76 (7th Cir. 2013); *see also Silva*, 856 F.3d at 831. But to have standing to pursue prospective injunctive relief, a plaintiff must allege an injury in fact that is "concrete and particularized" and "actual or imminent." *Scherr*, 703 F.3d at 1073–74. "[T]o establish injury in fact . . . , a plaintiff must allege a 'real and immediate' threat of future violations of their rights (in this case, [Saldana's] rights under the ADA)." *Id.* at 1074. The same analysis applies to claims under the Rehabilitation Act and the ACA. *See Marquez v. Riveredge Hosp., Inc.*, No. 21 C 3369, 2022 WL 832650, at *3 (N.D. Ill. Mar. 21, 2022).

Unless accompanied by continuing, present adverse effects, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Scherr*, 703 F.3d at 1074. Nor is it enough that the plaintiff has an intent to return to the place where she allegedly suffered her injury. *See id.* "Such 'some day' intentions—without any description of concrete plans, or indeed even any specifications of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)) (emphasis in original).

24

The defendant argues that Saldana cannot demonstrate a likelihood of future violations because there is no established pattern of her seeking medical care at Stroger Hospital and, thus, she cannot establish an intent to return. *See Juech*, 353 F. Supp. 3d at 785 ("One way to demonstrate the likelihood of returning to a defendant hospital is through an established pattern."). Specifically, the defendant contends that it is "highly unlikely" that Saldana will ever return to Stroger Hospital given that "(1) [she] regularly visited Loyola Gottlieb Hospital, (2) Stroger Hospital is quite far from her home, (3) Loyola Gottlieb Hospital is closer to her home, (4) [Saldana] testified that she only visited Stroger Hospital one time, and (5) [Saldana] remains quite angry with Stroger Hospital." (R. 77 at 17–18.)

The problem with the defendant's argument, however, is that "intent to return" is not the only way that a plaintiff can establish injury in fact for prospective injunctive relief; the threat of future injury "can also be shown by establishing that the plaintiff is reasonably deterred from the public [entity] because of the discrimination." *Access Living of Metro. Chi. v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1149 (N.D. Ill. 2018) (citing *Chapman v. Pier I Imports (U.S.) Inc.*, 631 F.3d 939, 949 (9th Cir. 2011) (en banc); *Scherr v. Marriot Int'l., Inc.*, 833 F. Supp. 2d 945, 951 (N.D. Ill. 2011), *aff'd*, 703 F.3d 1069 (7th Cir. 2013)). "For a deterrence injury to be sufficiently concrete and non-speculative, the deterrence must be reasonable[,]" and the plaintiff must establish that she would have been subjected to the defendant's unlawful conduct. *Id.* at 1149 & n.5 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184–85 (2000)).

Here, there is evidence in the record from which a reasonable factfinder could conclude that Saldana is deterred from returning to Stroger Hospital because of the defendant's repeated failures to provide an appropriate accommodation sufficient to achieve effective communication. While there is no dispute that Loyola Gottlieb Hospital is closer to Saldana's home and that she previously sought treatment there, (Pl.'s Response to Def.'s SOF ¶¶ 27, 29), Saldana testified that she does not have medical insurance and cannot continue treatment at Loyola for financial reasons. (Saldana Dep. 2 at 21:03–04, 22:09–12.) Further, Saldana's medical records indicate that she saw a primary care physician within Cook County Health in the past and was willing to see one again to determine the source of her breast pain. (R. 78-8 at 14.) According to Nemecek, Saldana attempted to return to Stroger Hospital in 2019 for treatment, but left without seeing a doctor because no in-person interpreter was available despite having called to schedule one in advance. (Nemecek Dep. at 41:06–46:13.) And Saldana testified that she called the defendant again in 2021 to make an appointment and requested an in-person interpreter, but that the woman who answered her call "seemed to get angry and hung-up on" her. (R. 80-1 at 17:24–18:16.) Though her pain has persisted, Saldana stated that she has not returned to Stroger Hospital for treatment because they do not have live interpreters. (Saldana Dep. 2 at 31:24–32:05, 35:03–11.)

Accordingly, the Court finds that Saldana has standing to pursue prospective injunctive relief for her disability discrimination claims, and thus denies the defendant's motion for summary judgment on this issue.

## CONCLUSION

The parties' cross-motions for summary judgment [76, 79] are denied. The parties shall submit a joint status report with proposed trial dates no later than January 18, 2024. Status hearing set for January 25, 2024, at 9:30 a.m.

Date: 1/5/2024

_____
JEREMY C. DANIEL
United States District Judge